Susan Martin – AZ Bar No. 014226
Jennifer Kroll – AZ Bar No. 019859
**MARTIN & BONNETT, P.L.L.C.**
4647 N. 32nd St., Suite 185
Phoenix, Arizona 85018
(602) 240-6900
Facsimile: (602) 240-2345
smartin@martinbonnett.com
jkroll@martinbonnett.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Seth Van Dorn, Derivatively on Behalf of Nominal Defendant Opendoor Technologies, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Eric Wu; John Rice; Jonathan Jaffe; Adam Bain; Jason Kilar; Glenn Solomon; Pueo Keffer; Cipora Herman; Carrie Wheeler, <br><br> Defendants, <br><br> and <br><br> Opendoor Technologies, Inc., a Delaware Corporation, <br><br> Nominal Defendant. | CASE NO.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Seth Van Dorn, on behalf of Opendoor Technologies, Inc. ("Opendoor" or the "Company"), derivatively, alleges the following based upon personal knowledge as to

himself and his own acts, and upon information and belief and investigation of counsel as to all other matters.  That investigation included, among other things, a thorough review and analysis of public documents, United States Securities and Exchange Commission ("SEC") filings, court filings, press releases and news articles concerning the Company, and the other facts as set forth herein:

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought on behalf of and for the benefit of Opendoor, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties.  Defendants' (defined below) actions have caused, and will continue to cause, substantial financial harm and reputational damage to Opendoor.

2.     The Company was formerly known as Social Capital Hedosophia Holdings Corp. II ("SCH") and operated as a special purpose acquisition company ("SPAC"), also called a blank-check company, which is a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person.

3.     On September 15, 2020, the Company, still operating as SCH, and Legacy Opendoor, a private company operating as a digital platform for residential real estate, reported their entry into a definitive agreement for the Merger (the "Merger Agreement"), which valued Legacy Opendoor at an enterprise value of $4.8 billion.

4.     On October 5, 2020, the Company filed a registration statement on Form S-4 with the SEC in connection with the Merger, which, after several amendments, was declared effective by the SEC on November 27, 2020 (the "November 2020 Registration Statement").

5.     On November 30, 2020, the Company filed a proxy statement/prospectus on Form 424B3 with the SEC in connection with the Merger, which formed part of the

November 2020 Registration Statement (the "Proxy" and, together with the November 2020 Registration Statement, the "December 2020 Offering Documents").

6.      On December 18, 2020, pursuant to the Merger Agreement, the Company deregistered as a Cayman Islands company, registered as a Delaware company, changed its name to "Opendoor Technologies Inc." and consummated the Merger.

7.      Following the Merger, the Company has operated a digital platform for buying and selling residential real estate in the U.S.  The Company's platform features a technology known as "iBuying," which is an algorithm-based process that purportedly enables Opendoor to make accurate market-based offers to sellers for their homes, and then flip those homes to buyers for a profit.

8.      Subsequent to the Merger, the Company also completed two secondary public offerings in 2021 of its common stock (the "SPOs").

9.       In connection with a secondary public offering conducted in February of 2021 (the "February 2021 SPO"), the Company filed a registration statement on Form S-1 which was declared effective by the SEC on February 4, 2021 (the "February 2021 Registration Statement").  The Company also filed with the SEC a prospectus related to the offering on Form 424B4 on February 8, 2021 (with the February 2021 Registration Statement, the "February 2021 SPO Documents").  Pursuant to the February 2021 SPO Documents, the Company offered for sale a total of 32,817,421 shares of its common stock. This offering was completed on February 9, 2021.  The shares were sold to the public at an offering price of $27.00 per share.  Through sales of common stock, the February 2021 SPO generated approximately $886 million in gross proceeds, and the Company received proceeds from the February 2021 SPO of approximately $859.5 million (net of underwriting discounts and commissions).

10.      In connection with a secondary public offering conducted in September of 2021 (the "September 2021 SPO"), the Company filed registration statement on Form S-1 on December 21, 2020, which was declared effective by the SEC on March 12, 2021 (the

"March 2021 Registration Statement").  The Company also filed with the SEC a prospectus supplement related to the offering on Form 424B3 on September 15, 2021 on Form 424B3 which amended and supplemented the prospectus the Company filed dated March 12, 2021 (with the March 2021 Registration Statement, the "September 2021 SPO Documents") and, together with the February 2021 SPO Documents and the December 2020 Offering Documents, the "Offering Documents").  Pursuant to the September 2021 SPO Documents, a major stockholder of Opendoor, SVF Excalibur (Cayman) Limited ("SVF" or "Selling Stockholder") offered for sale a total of 32,200,000 shares of Opendoor common stock. These shares were sold to the public at a price of $16.69 per share, generating a total of approximately $537 million.  The September 2021 SPO was completed on September 17, 2021.

11.    The December 2020 Offering Documents, the February 2021 SPO Documents, and the September 2021 Offering documents are sometimes collectively referred to herein as the "Offering Documents."

12.    The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Additionally, Defendants (as defined herein) made materially false and misleading statements regarding the Company's business, operations, and prospects.  The Offering Documents contained and Defendants (as defined herein) made false and/or misleading statements and/or failed to disclose that: (i) the algorithm ("Algorithm") used by the Company to make offers for homes could not accurately adjust to changing house prices across different market conditions and economic cycles; (ii) as a result, the Company was at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations; (iii) accordingly, Defendants overstated the purported benefits and competitive advantages of the Algorithm; and (iv) as a result, the

Offering Documents and Defendants' public statements were materially false and/or misleading and failed to state information required to be stated therein.

13.     In February of 2022, the Company reported significant losses which started to reveal to the market that its Algorithm failed to live up to the representations Opendoor made in the Offering Documents.  On September 19, 2022, citing a review of industry data, *Bloomberg* reported that the Company appeared to have lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties).  *Bloomberg* further reported that the data was even worse in key markets such as Los Angeles, California, where the Company lost money on 55 percent of sales, and Phoenix, Arizona, where it lost money on 76 percent of sales.

14.     Following the *Bloomberg* report, the Company's stock price fell $0.50 per share, or 12.32 percent, over the following two trading sessions, to close at $3.56 per share on September 20, 2022-an 88.61 percent decline from the Company's first post-Merger closing stock price of $31.25 per share on December 21, 2020 (the "Initial Closing Price").

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), and SEC Rule 10b-5, 17 C.F.R. §§ 240.10b-5, promulgated thereunder. This Court has jurisdiction over the subject matter of this action under §27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States of America.

16.     The Court has jurisdiction over each defendant because each defendant is an individual who has sufficient minimum contacts with Arizona so as to render the exercise of jurisdiction by the Arizona courts permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District because one or more of the defendants either resides in or maintains executive offices in this District, including Nominal Defendant Opendoor, a substantial portion of the transactions and wrongs complained of herein –

including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to Opendoor – occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## **PARTIES**

### **Plaintiff**

18.     Plaintiff is a current Company shareholder.  Plaintiff will continue to hold Company shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### **Nominal Defendant**

19.     Nominal Defendant Opendoor is a Delaware corporation with its principal executive offices located in Tempe, Arizona.

### **Director Defendants**

20.     ***Defendant Eric Wu*** ("Wu") has served as the Chief Executive Officer ("CEO") of the Company and the Chairman of the Board.  Defendant Wu received $370,240,992 in 2020 and $112,333,540 in 2021 in compensation from the Company.

21.     ***Defendant John Rice*** ("Rice") has served as a member of the Board since March 2021 and serves as a member of the Board's Nominating and Corporate Governance Committee.  Defendant Rice received $627,711 in compensation from the Company in 2021.

22.     ***Defendant Jonathan Jaffe*** ("Jaffe") has served as a member of the Board since June 2018 and serves as a member of the Board's Nominating and Corporate Governance Committee.  Defendant Jaffe received $263,726 in compensation from the Company in 2021.

23.     ***Defendant Adam Bain*** ("Bain") has served as a member of the Board since December 2020 and serves as a member of the Board's Audit Committee and Compensation

Committee.  Defendant Bain received $282,896 in compensation from the Company in 2021.

24.  **Defendant Jason Kilar** ("Kilar") has served as a member of the Board since March 2019 and serves as chair of the Board's Nominating and Corporate Governance Committee.  Defendant Kilar received $274,421 in compensation from the Company in 2021.

25.  **Defendant Glenn Solomon** ("Solomon") has served as a member of the Board since February 2015 and serves as chair of the Board's Compensation Committee. Defendant Solomon received $280,077 in compensation from the Company in 2021.

26.  **Defendant Pueo Keffer** ("Keffer") has served as a member of the Board since October 2015 and serves as a member of the Board's Audit Committee.  Defendant Keffer received $274,421 in compensation from the Company in 2021.

27.  **Defendant Cipora Herman** ("Herman") has served as a member of the Board since December 2020 and serves as chair of the Board's Audit Committee.  Defendant Herman received $636,877 in compensation from the Company in 2021.

28.  **Defendant Carrie Wheeler** ("Wheeler") has served as the Chief Financial Officer ("CFO") of the Company during the relevant period.  Defendant Wheeler received $50,275,445 in 2020 and $350,000 in 2021 in compensation from the Company.   In December 2022, Wheeler became the CEO of the Company and joined the Board.

29.  Defendants Wu, Rice, Jaffe, Bain, Kilar, Solomon, Keffer, Herman and Wheeler are referred to herein as the "Director Defendants" or "Defendants".

## SUBSTANTIVE ALLEGATIONS

**Background**

30.  The Company was formerly known as SCH and operated as a SPAC.

31.  On September 15, 2020, the Company, then still operating as SCH, and Legacy Opendoor, a private company operating as a digital platform for residential real estate, announced their entry into the Merger Agreement, which valued Legacy Opendoor at an enterprise value of $4.8 billion.

32.     On October 5, 2020, the Company filed a registration statement on Form S-4 with the SEC in connection with the Merger, which, after several amendments, was declared effective by the SEC on November 27, 2020.  On November 30, 2020, the Company filed the Proxy on Form 424B3 with the SEC in connection with the Merger, which formed part of the November 2020 Registration Statement.

33.     On December 18, 2020, pursuant to the Merger Agreement, the Company, among other things, deregistered as a Cayman Islands company, registered as a Delaware company, changed its name to "Opendoor Technologies Inc.," and consummated the Merger, whereby, among other things, Legacy Opendoor became a wholly owned subsidiary of the Company.

34.     Following the Merger, the Company has operated a digital platform for buying and selling residential real estate in the U.S.  The Company's platform features a technology known as "iBuying," which is an algorithm-based process that enables the Company to make accurate market-based offers to sellers for their homes, and then flip those homes to buyers for a profit.

35.     On December 21, 2020, the Company's post-Merger common stock and warrants began publicly trading on the NASDAQ under the ticker symbols "OPEN" and "OPENW," respectively.

36.     In February of 2021, the Company offered for sale to the public a total of 32,817,421 shares of its common stock pursuant to the February 2021 SPO Documents. These shares were sold to the public at an offering price of $27.00 per share.  Through sales of common stock, the February 2021 SPO generated approximately $886 million in gross proceeds, and the Company received proceeds from the February 2021 SPO of approximately $859.5 million (net of underwriting discounts and commissions). The February 2021 SPO was completed on February 9, 2021.

37.     In September of 2021, the Selling Stockholder offered for sale to the public a total of 32,200,000 shares of the Company common stock for sale pursuant to the

September 2021 SPO Documents. These shares were sold to the public at a price of $16.69 per share, generating a total of approximately $537 million. The September 2021 SPO was completed on September 17, 2021.

## THE MATERIALLY FALSE AND MISLEADING STATEMENTS

38. On December 21, 2020, the Company's post-Merger common stock began publicly trading on the NASDAQ pursuant to the materially false and misleading statements and omissions contained in the December 2020 Offering Documents.

39. The December 2020 Offering Documents stated the following regarding Legacy Opendoor's proprietary Algorithm:

> While the real estate industry lends itself to the use of a plethora of publicly sourceable data, much of this data lacks the quality and specificity essential to accurately price homes. Since Opendoor's founding, we have built world-class data science capabilities and systematized tooling to gather, aggregate and synthesize an expanding catalogue of proprietary, hyperlocal data in order to improve and automate pricing decisions.

40. With respect to the proprietary offline data used by the Algorithm, the December 2020 Offering Documents stated:

> We have conducted over 150,000 home assessments during which we collect over 100 data points on each home and its surroundings. We have invested in building custom inspection and operator tooling to systematically source and translate home features into a robust data library. Once we have purchased a home, we can collect additional proprietary home-level data through visitor feedback, visitor traffic and duration of visits. These proprietary data points have led us to make over one billion annotations and corrections to Multiple Listing Services ("MLS") and tax assessor data, as well as build out new, non-traditional geospatial data assets, such as power line proximity and road noise level. The additional home level data we collect from local vendors provides structured feedback on each home and further strengthens our data moat.

41. With respect to the "pricing accuracy" of the Algorithm and its purported real-time reaction time to macro- and micro-economic conditions, the December 2020 Offering Documents stated:

Our unique data works in concert with our pricing algorithms. These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management. Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations. Advancements in model sophistication have accelerated our feedback loops, such that our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions. Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

42.     On December 21, 2020, the Company's post-Merger common stock began publicly trading on the NASDAQ pursuant to the materially false and misleading statements and omissions contained in the December 2020 Offering Documents.

43.     On February 4, 2021, the Company filed with the SEC the February 2021 SPO Documents. The February 2021 SPO Documents containing substantively the same statements as referenced in paragraphs 39-40, regarding the Company's proprietary Algorithm, the data powering the Algorithm, the Algorithm's purported pricing accuracy, and the Algorithm's purported real-time reaction to macro- and micro-economic conditions.

44.     On March 4, 2021, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 Form 10-K"). The 2020 Form 10-K contained substantively the same statements as referenced in paragraphs 39-40, regarding the Company's proprietary Algorithm, the data powering the Algorithm, the Algorithm's purported pricing accuracy, and the Algorithm's purported real-time reaction to macro and micro-economic conditions.

45.     Appended as exhibits to the 2020 Form 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Wu and Wheeler certified that "[t]he [2020 10-K] fully complies with the requirements of Section 13(a) or

15(d) of the [Exchange Act]" and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

46.     On September 15, 2021, the Company filed the September 2021 SPO Documents with the SEC.  The September 2021 SPO Documents contained substantively the same statements as referenced in paragraphs 39-40, regarding the Company's proprietary Algorithm, the data powering the Algorithm, the Algorithm's purported pricing accuracy, and the Algorithm's purported real-time reaction to macro and micro-economic conditions.

### THE TRUTH IS PARTIALLY REVEALED AS THE COMPANY ISSUES FURTHER FALSE AND MISLEADING STATEMENTS

47.     On February 24, 2022, the Company announced that, despite its representations about the efficacy of its Algorithm, it was sustaining massive losses, which led to a significant drop in its stock price.  According to an article from *The Real Deal* dated February 25, 2022, this drop was widely attributed to a decline in the Company's contribution margin, which measures profitability while factoring in costs related to selling homes.  Therefore, the drop in stock price was attributable to the Company's failure to price homes at profitable levels, which began to reveal that the Algorithm was not working as the Company represented.

48.     On this news, the Company's stock price dropped $2.54, or 23 percent, to close at $8.44 on February 25, 2022.

49.     While the Company's misrepresentations were beginning to come to light, the Company continued to represent to investors that its Algorithm could profitably price homes.  On February 24, 2022, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial results for the quarter and year ended December 31, 2021 (the "2021 Form 10-K"). The 2021 Form 10-K contained substantively the same

statements as referenced in paragraph 41, regarding the Algorithm's purported pricing accuracy and real-time reaction to macro- and micro-economic conditions.

50.     For instance, with respect to the Company's improvements to its proprietary offline data for the Algorithm, the 2021 Form 10-K stated:

> We have conducted approximately 375,000 assessments during which we collect over 100 data points on each home and its surroundings. We have invested in building custom inspection and operator tooling to systematically source and translate home features into a robust data library. These proprietary data points have led us to make approximately 1.4 billion annotations and adjustments to MLS and tax assessor data, as well as build out unique geospatial data assets, such as power line proximity and road noise level. Once we list a home for resale, we collect additional home level demand data such as home visits and visitor feedback, which enable us to continuously calibrate our resale strategy and acquisition home pricing.

51.     With respect to how the Company utilized the Algorithm to generate "Industry-Leading Pricing Capabilities", the 2021 Form 10-K stated:

> To create our home offers, we algorithmically produce both an estimated offer price and an assessment of our confidence level in that estimate, and we then further validate that estimate with in-depth underwriting and risk assessment, including additional review from our in-house pricing associates, to finalize the offer. We dynamically adjust our offers to account for the level of certainty in pricing each home. This degree of certainty can be impacted by factors such as macro conditions, the condition or attributes of a home, or depth of home comparables. ***We are constantly recalibrating our view of pricing and where market values are trending using high-frequency detailed metrics across all segments of our business, including numerous inputs related to the dynamics of market demand and supply across markets, home types and time periods.*** [Emphasis added].

52.     The 2021 Form 10-K also represented that the Company had implemented a "Robust Risk Management Framework," stating:

> ***Since our inception, we have prioritized investment in our pricing capabilities across our home acquisition processes and our forecasting and resale systems, and expect to continue to do so.*** These investments pair with a strong risk management focus that is embedded in our pricing, finance and operations teams. We evaluate the quality of our pricing models and processes using high-frequency detailed metrics across all segments of our business, including home

acquisition, resale strategy and inventory health. All of our pricing decisions are managed centrally, giving us a high degree of control over our overall growth and margin objectives.  [Emphasis added].

53.     In addition, the 2021 Form 10-K assured investors that "[w]hile residential real estate markets are subject to fluctuations, as with any market, we believe we are well positioned to manage our risk exposure due to," among other things, the Company's "pricing models and inventory management systems [that] are designed to recalibrate to market signals on a daily basis."

54.     In this same vein, the 2021 Form 10-K further represented:

> *[C]hanging market conditions are reflected in our pricing for new acquisitions, largely leaving previously-acquired inventory at risk to potential market volatility.* In addition, we employ sophisticated resale pricing management systems that allow us to optimize sell-through and margin using real-time, local market demand information, including down to an individual home level. We believe that the quality and scale of information we utilize in our inventory management decisions and our ability to manage these decisions across a scaled, diversified portfolio provides us with a structural advantage over individual sellers or agents in the traditional home selling process. [Emphasis added].

55.     Appended as exhibits to the 2021 Form 10-K were substantively the same SOX certifications as referenced in paragraph 45.

56.     On August 4, 2022, the Company issued a press release ("August 4 Press Release") reporting the Company's second quarter 2022 results including, among other things, third quarter 2022 adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") guidance of $(175) million to $(125) million.

57.     Notwithstanding the August 4 Press Release's disclosure that the Company could potentially lose as much as $175 million in adjusted EBITDA in the third quarter of 2022, Defendant Wu, as quoted in the August 4 Press Release, continued to reassure investors regarding the purported benefits of the Company's Algorithm, stating: "[C]urrent market volatility is requiring us to move swiftly and with discipline in managing risk and overall inventory health. *We are leveraging our* responsive pricing and operations platform . .

. to operate from a position of strength and solidify our leadership as the category winner." (Emphasis added).

58.     That same day, Defendants issued a letter ("August 4 Letter") to shareholders indicating that "the housing market has moved rapidly in response to the Fed's aggressive rate hikes in an effort to curb inflation" and that "[t]his resulted in a steep increase in mortgage rates, which in turn catalyzed a slowdown in the rate of home transactions and lower levels of home price appreciation from all-time highs early in the year."

59.     The August 4 Letter, however, reassured the Company shareholders that "[o]ur investments in our platform have enabled an agile and low cost operating system that allows us to scale up and down gracefully across seasons and cycles," and "[w]e are ready and well-positioned with our responsive pricing strategies, flexible operating model, low cost structure, and strong balance sheet *to navigate near-term volatility* and invest in the future of our platform."  (Emphasis added).

60.     On a conference call on August 4, 2022, Defendant Wheeler reassured an analyst that even in the current volatile market "*our* systems are doing exactly what they're designed to do, which is responding very, very *quickly, adjusting prices to market* and we've been raising spreads and new acquisitions."  (Emphasis added)

61.     On August 5, 2022, as a result of Defendants' positive representations, regarding the Algorithm's ability to navigate recently observed volatility in the housing market, the Company's stock price jumped 21.7 percent to close at $5.72 per share.

62.     The statements referenced in paragraphs 38-41,47-49, 49-55, 57, and 59-60 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Algorithm used by the Company to make offers for homes could not accurately adjust to changing house prices across different market conditions and economic cycles; (ii) as a result, the Company was at an increased risk of

sustaining significant and repeated losses due to residential real estate pricing fluctuations; (iii) accordingly, Defendants overstated the purported benefits and competitive advantages of the Algorithm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

63.     Further, the undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties, and risks that required disclosure in the Offering Documents.  Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure in the Offering Documents of "the material factors that ma[d]e an investment in [Opendoor] speculative or risky" and an explanation of "how [the] risk affect[ed] [Opendoor] or the securities being offered." The Offering Documents failed to disclose material facts necessary to apprise common stock purchasers of the true risks inherent in investing in the Company in violation of Item 303 and Item 105.

64.     Defendants failed to disclose that the Algorithm it used to make offers for homes could not accurately adjust to changing house prices across different market conditions and economic cycles and, as a result, the Company was at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations. The Company's failure to disclose these facts violated Item 303 because these undisclosed facts were known and would (and did) have an unfavorable impact on the Company's financial results. The Company's failure to make these disclosures also violated Item 105, because these specific risks were not adequately disclosed, even though they were significant factors making an investment in Opendoor's stock speculative or risky.

### THE TRUTH BEHIND THE COMPANY'S MISREPRESENTATIONS ARE FURTHER REVEALED

65.     On September 19, 2022, citing a review of industry data, *Bloomberg* reported that the Company appeared to have lost money on 42 percent of its transactions in August 2022, stating:

> [Opendoor], which sells thousands of homes in a typical month, lost money on 42% of its transactions in August, according to research from YipitData. Opendoor's performance — as measured by the prices at which it bought and sold properties — was even worse in key markets such as Los Angeles, where the company lost money on 55% of sales, and Phoenix, where the share was 76%.
>
> The losses, which don't include fees charged to customers or expenses incurred in renovating and marketing homes, have been looming since the housing market turned suddenly in recent months.
>
> * * *
>
> The company's rocky summer is reminiscent of the pricing problems that doomed Zillow Group Inc.'s iBuying business last year, according to a research note from Mike DelPrete, a scholar-in-residence at the University of Colorado Boulder. That doesn't mean Opendoor is going to shut down the business, but it demonstrates the depth of the losses — and September is likely to be even worse than August, DelPrete's analysis shows.
>
> Opendoor's metrics are in the danger zone," DelPrete said in an interview. "They are very close to where Zillow was in its worst moments."
>
> The iBuying model relies on acquiring homes, making light repairs and reselling the properties — often within a few months of the initial purchase. When home prices were skyrocketing earlier in the year, Opendoor banked easy profits. Then dwindling affordability and mortgage rates soaring toward 6% this spring finally pushed would-be buyers to the sidelines.
>
> By June, median home prices had begun to decline in some areas, especially the Sun Belt markets that had been frothiest in the pandemic boom days. The shift caught Opendoor by surprise, leaving it to offload thousands of properties it had agreed to purchase when prices were rising.
>
> * * *
>
> The shares slid 4.7% to $3.87 at 3:28 p.m. New York time Monday. They were down 72% this year through the close on Sept. 16.  Bloomberg's findings

evidenced the failure of Opendoor's Algorithm to adjust accurately to changing market conditions.

66. Following the *Bloomberg* report, the Company's stock price fell $0.50 per share, or 12.32 percent, over the following two trading sessions, to close at $3.56 per share on September 20, 2022.

## DAMAGES TO THE COMPANY

67. As a direct and proximate result of Defendants' conduct, the Company will lose and expend many millions of dollars.

68. Such expenditures include, but are not limited to, legal fees associated with the securities class action filed against the Company entitled *Alich v. Opendoor Technologies, Inc., et al.*, Case No. 2:22-cv-01717 (D. Ariz.) (the "Securities Class Action").

69. Such expenditures also include, but are not limited to, unwarranted compensation and benefits paid to Defendants who breached their fiduciary duties to the Company, especially when those benefits were tied to the performance of the Company.

70. As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and unjust enrichment.

## DUTIES OF DEFENDANTS

71. By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

72.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

73.     Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

74.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

75.    Each Defendant, by virtue of his/her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

76.    Each director and officer of the Company owed to the Company the fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, Defendants had a duty not to advance their own personal, financial, or economic

interests over, and at the expense of, the Company's public shareholders, or to allow other the Company directors, officers, and/or employees to do so.  Each director and officer of the Company also owed the Company and its shareholder-owners the duty to maintain the Company's confidential information and prevent others from misappropriating and/or trading while in possession of the Company's proprietary, confidential information.

77.    Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.  Defendants' subjected the Company to the costs of defending and the potential liability from a class action lawsuit for violations of the federal securities laws.  As a result, the Company has expended, and will continue to expend, significant sums of money.

78.    Defendants' actions have irreparably damaged the Company's corporate image and goodwill.  Moreover, Defendants have misled the investing public to such an extent that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

79.    In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.    Defendants collectively and individually initiated a course of conduct that was designed to and did, or as a result of their reckless or grossly negligent behavior did: (i) conceal the fact that the Company was improperly portraying the information described herein; (ii) maintain Defendants' executive and directorial positions at the Company and the profits, power and prestige that Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of the Company,

regarding Defendants' management of the Company's operations, the Company's financial health and stability, and future business prospects.

81.     Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct, pursuant to which they caused the Company to conceal the fact that it was misrepresenting the described information herein and that Defendants had breached their fiduciary duties in managing the affairs of the Company.  Further, Defendants took actions that were not the product of valid business judgment, but rather, the result of a desire to obtain personal profits and perquisites.

82.     The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, abuse of control, gross mismanagement and unjust enrichment, and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

83.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or with gross negligence misrepresent its business prospects and release improper statements, taking actions that were not the product of valid business judgment and failing to properly manage the affairs of the Company.  Because the actions described herein occurred under the authority of the Board and/or the Company's officers, each of the Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

84.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

85.     Defendants owed to the Company a duty to insure that the Company's financial reporting and disclosures fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.

### DERIVATIVE AND DEMAND FUTILITY
### ALLEGATIONS FOR THE BOARD OF OPENDOOR

86.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

87.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company because of the breaches of fiduciary duty by Defendants and unjust enrichment, as well as the aiding and abetting thereof.

88.     The Company is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

89.     Plaintiff is, and at all relevant times has been, a Company shareholder. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

90.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

91.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board of the Company to institute this action against the Director Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

92.     The Board is currently comprised of Defendants Wu, Rice, Jaffe, Bain, Kilar, Solomon, Keffer, Herman and Wheeler.  Thus, Plaintiff is required to show that a majority

of the Current Directors, *i.e.,* five, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

93.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact alleged herein and/or the other schemes described herein, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.  Because of their advisory, executive, managerial, and directorial positions with the Company, the Directors had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

94.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements and/or omissions alleged herein and/or the other schemes described herein and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for the Company shareholders. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors.

**Defendants Bain, Herman and Keffer**

95.    Defendants Bain, Herman, and Keffer are not disinterested or independent, and therefore, are incapable of considering a demand because they serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, inter alia, public disclosure requirements.  Throughout the Relevant Period, however, these defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions

regarding the Algorithm used by the Company to make offers to purchase homes and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Bain, Herman, and Keffer cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

**Defendants Wheeler and Wu**

96.     Defendants Wheeler and Wu are not disinterested or independent, and therefore, are incapable of considering demand because Defendants Wheeler (as Chief Executive Officer) and Wu (President) are employees of the Company who derive substantially all of their income from their employment with the Company, making them not independent. As such, Defendants Wheeler and Wu cannot independently consider any demand to sue themselves for breaching his fiduciary duties to the Company, because that would expose them to liability and threaten their livelihood.

97.     Accordingly, Defendants Wheeler and Wu lack independence from Defendants Solomon and Bain, defendants who are not disinterested and who exert influence over defendant Wheeler's and Wu's compensation by virtue of their positions as representing the entire Compensation Committee.

98.     This lack of independence and financial benefits received by Defendants Wheeler and Wu render them incapable of impartially considering a demand to commence and vigorously prosecute this action.

### FIRST CAUSE OF ACTION

**Against the Director Defendants for Violations of § 10(b)
of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

99.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

100.     The Director Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

101.    The Director Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    The Director Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

103.    The Director Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Opendoor were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

104.    The Director Defendants, by virtue of their receipt of information reflecting the true facts of Opendoor, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Opendoor, participated in the fraudulent scheme alleged herein.

105.    As a result of the foregoing, the market price of Opendoor's common stock was artificially inflated during the Relevant Period. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of the Company's common stock in purchasing Opendoor common stock at

prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

## SECOND CAUSE OF ACTION

### Against the Director Defendants For Breach of Fiduciary Duty

106.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

107.   Defendants owed and owe Opendoor fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe Opendoor the highest obligation of good faith, fair dealing, loyalty and due care.

108.   Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

109.   Each of the Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company and failed to correct the Company's publicly reported financial statements.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

110.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Opendoor has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

111.   Plaintiff, on behalf of Opendoor, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against Defendants Wheeler and Wu For Gross Mismanagement

112.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

113.   By their actions alleged herein, Defendants Wheeler and Wu, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and

fiduciary duties with regard to prudently managing the assets and business of Opendoor in a manner consistent with the operations of a publicly held corporation.

114.   As a direct and proximate result of Defendants Wheeler and Wu's gross mismanagement and breaches of duty alleged herein, Opendoor has sustained significant financial and reputational damage.

115.   As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

116.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**Against Director Defendants For Unjust Enrichment**

117.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

118.   By their wrongful acts and the omissions of material fact that they caused to be made, Director Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

119.   The Director Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements and omissions, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of Company, or received compensation that was unjust in light of the Director Defendants' bad faith conduct in setting their own compensation at excessive levels.

120.   Plaintiff, as a shareholder and a representative of the Company, seeks restitution from Director Defendants and seeks an order from this Court disgorging all profits -- including benefits, stock awards and other compensation, including any performance-based or valuation-based compensation, obtained by the Director Defendants due to their wrongful conduct and breach of their fiduciary duties.

1

## PRAYER FOR RELIEF

2      **WHEREFORE,** Plaintiff prays for relief and judgment as follows:

3      A.      Against Defendants in favor of the Company for the amount of damages

4 sustained by the Company as a result of Defendants' breaches of fiduciary duties, abuse

5 of control, gross mismanagement, and waste of corporate assets;

6      B.      Awarding to Plaintiff the costs and disbursements of the action, including

7 reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

8      C.      Granting such other and further relief as the Court deems just and proper.

9

## JURY TRIAL DEMANDED

10      Plaintiff hereby demands a trial by jury.

11 DATED: March 15, 2023

12

13                              **MARTIN BONNETT, PLLC**

14                              By: s/ Jennifer Kroll
                               Jennifer Kroll
15                              Susan Martin
                               4647 N. 32nd St., Suite 185
16                              Phoenix, 85018
                               Telephone: (602) 240-6900
17                              Email: jkroll@martinbonnett.com
                               Email: smartin@martinbonnett.com
18

19                              **GAINEY McKENNA & EGLESTON**
                               Thomas J. McKenna
20                              Gregory M. Egleston (*pro hac vice* app. to be filed)
                               501 Fifth Avenue, 19th Fl.
21                              New York, NY 10017
                               Tel: (212) 983-1300
22                              Fax: (212) 983-0383
                               Email: tjmckenna@gme-law.com
23                              Email: gegleston@gme-law.com

24

25                              *Attorneys for Plaintiff*

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**VERIFICATION**

2

I, SETH VAN DORN, declare that I have reviewed the Verified Shareholder

3 Derivative Complaint ("Complaint") prepared on behalf of Opendoor Technologies,

4 Inc. and authorize its filing.  I have reviewed the allegations made in the Complaint,

5 and to those allegations of which I have personal knowledge, I believe those

6 allegations to be true.  As to those allegations of which I do not have personal

7 knowledge, I rely on my counsel and their investigation and for that reason believe

8 them to be true.  I further declare that I am a current holder, and have been a holder,

9 of Opendoor Technologies, Inc. common stock at all relevant times.

10

11

_____

12 SETH VAN DORN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1